**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


JOSEPH WATSON,               )
                                         )       Civil Action No. 09 – 87J
                  Plaintiff,     )
                                         )
                  v.            )       Chief Magistrate Judge Lisa Pupo Lenihan
                                         )
JEFFREY BEARD, *et al.*,     )
                                       )       ECF Nos. 114, 115, 119, 122
                  Defendants.   )


<u>**MEMORANDUM OPINION AND ORDER**</u>

      Pending before the Court are Motions for Summary Judgment filed by Plaintiff (ECF Nos. 114, 122); Defendants Glass, Jechonech, Papuga, Pritts, Ream, Snyder, Troy, and Verneau (ECF No. 115); and Defendant Fisher (ECF No. 119). Upon review of the motions, the briefs in support thereof, the submissions of all parties, and the Third Circuit Court of Appeals Opinion dated July 11, 2011, the Court finds that there is no genuine issue as to any material fact and Defendants are entitled to judgment in their favor as a matter of law.

**I.      PROCEDURAL HISTORY**

      Joseph Watson ("Plaintiff") is a prisoner currently in the custody of the Pennsylvania Department of Corrections. He initiated the instant action on April 3, 2009, alleging that Defendants violated his rights as protected by the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants moved to dismiss the claims in Plaintiff's complaint, and in a Report and Recommendation dated April 12, 2010, the undersigned recommended that their motions be

granted. The Report was adopted as the Opinion of the Court, and, on May 27, 2010, Plaintiff's complaint was dismissed. Plaintiff appealed, and on July 11, 2011, the Third Circuit Court of Appeals affirmed in part and reversed in part. The Third Circuit's Opinion stated, in pertinent part:

> ". . . we will affirm the great majority of the District Court's judgment, but will vacate and remand on the retaliation and Fourth Amendment claims as discussed above. We also will vacate and remand on his access-to-courts claims, as he may be able to cure the defect in his allegations if granted leave to amend; on all other claims, amendment would be futile."

As a result of the remand, Plaintiff was ordered to file an amended complaint consistent with the Circuit's Opinion. Plaintiff filed his amended complaint on January 12, 2012, and was allowed to file a second amended complaint, which he filed on February 22, 2012. Defendants again filed motions to dismiss, this time seeking dismissal of Plaintiff's access to courts claim. The Court granted their motions on August 21, 2012.[1]

Plaintiff's retaliation and Fourth Amendment claims remain and are the subject of Defendants' pending Motions for Summary Judgment. Plaintiff has also filed Motions for Summary Judgment, which the Court will partially construe as responses in opposition to Defendants' Motions. The Motions are now ripe for review.

## II.   ALLEGATIONS AND FACTUAL BACKGROUND

As an initial matter, the Court has found it extremely difficult, and unduly burdensome, to piece together the sequence of events that are relevant to the remaining issues subject to dispute herein. Plaintiff's second amended complaint and subsequent filings are disjointed and lack any form of chronological order whatsoever. He fails to provide dates for most of the events he describes, and, most significantly, fails to allege the number of times he was actually

---

[1] Full consent to proceed before the magistrate judge was received on April 21, 2010.

searched during the relevant time period and the manner in which those particular searches were conducted. Importantly, the reasonableness surrounding these searches is one of only two remaining issues that remain subject to dispute. The Court has expended much time and effort into trying to decipher Plaintiff's filings and it is has done its best to present the events in the order in which they appeared to have occurred. To the extent the Court is unable to so, it is due to Plaintiff's failure to abide by the general rules of pleading found in the Federal Rules of Civil Procedure.

To begin with, the conduct at issue in this case occurred while Plaintiff was working in the kitchen at SCI-Somerset from 2006 until 2008. Plaintiff alleges that sometime beginning in 2006, members of the kitchen staff started to "round up" young, black inmate workers four at a time and take them into the staff locker room to be strip searched as punishment for wearing their pants too low.[2] This was allegedly done at the direction of Defendants Fisher (the food services manager) and Ream (the food services supervisor). Notably, the kitchen staff was composed primarily of white workers. Plaintiff maintains that the kitchen staff conducted the presumably needless searches either out of racism or for no other reason than to humiliate and to flaunt their authority over the black inmates. Feeling the need to speak out for the young inmates who would not do so for themselves, Plaintiff protested about the "abusive" searches, and in retaliation for doing so he allegedly became the target of ongoing sexual harassment by the kitchen staff, particularly from Defendant Verneau (a corrections food service instructor). Although the Third Circuit read Plaintiff's original complaint to have alleged that Defendant Verneau "actively and repeatedly molested and sexually harassed" him during numerous

---

[2] During a strip search, inmates are visually cavity searched. For purposes of this Opinion, the terms "strip search", "visual search" and "cavity search" will be used interchangeably.

"invasive strip searches," it appears from the record that Plaintiff may have been strip searched only on two occasions, once in 2006 and again in 2007. Defendant Verneau is NOT alleged to have touched Plaintiff inappropriately, or even at all on either occasion. However, Plaintiff characterizes the searches as "sexual abuse" and "sexual harassment" because, in his opinion, they were conducted without a legitimate penological purpose and for Defendant Verneau's sexual pleasure. Notwithstanding this averment, there is evidence in the record that Defendant Verneau conducted at least one of the searches pursuant to orders given to him by Defendant Ream and that the searches were conducted as a result of inmates stealing food from the kitchen.

At some point in time, possibly late 2006 or early 2007, Plaintiff, who was fed up with the ongoing searches of the black inmate workers, filed a grievance. This grievance is not part of the record and Plaintiff does not provide the date, or even the month, in which it was filed. Also, Plaintiff's grievance record does not indicate that such grievance was ever even filed. Nevertheless, he alleges that the grievance was forwarded to Defendant Fisher who then called Plaintiff into his office, personally apologized and asked Plaintiff to withdraw his complaint after promising the searches would cease. Plaintiff states that the situation briefly improved but the searches later intensified in 2007, at which time pat-down searches were allegedly implemented.[3] Plaintiff alleges that during these pat-down searches, some of which he characterizes as "rough," Defendant Verneau would massage his genitals through his clothing and grab and squeeze his penis while making statements suggesting that he enjoyed it.

Possibly in December, 2007, Plaintiff and another inmate were approached by Defendant Verneau during their morning break at which time Defendant Verneau asked Plaintiff if he was

_____

[3] Although unclear, it appears Plaintiff means that inmates were pat searched each day upon entering and leaving the kitchen.

"ready to dance" for him, presumably implying that Plaintiff was his personal stripper. In an attempt to avoid being searched, Plaintiff walked away and locked himself in the bathroom.

Sometime later that month, Plaintiff made a verbal complaint to Defendant Fisher regarding the sexual abuse that was taking place during the pat-down searches. Plaintiff threatened to take his complaints to the Deputy Superintendent, but once again Defendant Fisher promised Plaintiff that things would change.

On January 13, 2008, Plaintiff was pat searched by Defendant Verneau and found to have thirty sugar packets hidden in his hat. Plaintiff maintains that he only had fourteen sugar packets and that most inmates carried sugar with them throughout the day for their coffee, but, in any event, he was written up, assessed the cost of the sugar and sent back to his housing unit.

On January 15, 2008, Plaintiff filed Grievance #214850, alleging that the pat-down search conducted by Defendant Verneau constituted harassment and/or sexual harassment and that it was conducted in retaliation for filing grievances and complaints about the harassing searches of the inmates.

Plaintiff states that he met with Defendants Fisher, Ream and Verneau on January 28, 2008, and informed them that he was going to "blow the whistle" on the ongoing sexual harassment occurring in the kitchen and the sexual activity that was allegedly occurring between the kitchen staff and the inmate workers, some of which appears to have been consensual. Defendants Fisher and Ream tried to talk him out of pursuing criminal charges but to no avail.

Later that day, Defendants Fisher, Glass (major of the guards), and Papuga (captain of the guards) sent Pratts and Troy (two guards) to Plaintiff's cell allegedly for the purpose of confiscating all evidence Plaintiff had against the kitchen staff members. An investigative search of Plaintiff's cell resulted in the filing of a misconduct against him, charging him with #29 -

engaging in or encouraging unauthorized group activity, #32 - possession or circulation of a petition, and #36 - possession of contraband. The search was apparently ordered after a confidential informant provided reliable information to the Security Office that Plaintiff had started a petition complaining about the increased number of inmate searches in the kitchen. Plaintiff states that he had obtained "sworn affidavits" from several other inmates who were also allegedly having problems with abusive searches and he had half-way prepared a criminal complaint that he intended to file with the police. Plaintiff states that these documents were confiscated and later destroyed by Defendant Snyder (a security lieutenant).[4] Following a hearing on February 4, 2008, Plaintiff was found guilty of #29 and #36, but #32 was dismissed.[5] He was sanctioned to sixty days in disciplinary confinement.

The following day, on February 5, 2008, Plaintiff filed Grievance #217079, alleging that his misconduct was issued in retaliation for having filed Grievance #21480 on January 15, 2008, complaining about the abusive searches occurring in the kitchen. As a result of Plaintiff's grievance, Sylvia Gibson, Deputy Superintendent for Centralized Services, conducted an interview with Plaintiff, and others, and determined that his charges pertaining to inappropriate pat-down searches were unsubstantiated.

After receiving a letter from Plaintiff alleging that staff had illegally searched him, that the kitchen staff members were racist and that Defendants Fisher, Papugo and Glass illegally seized his court documents, an investigation was initiated by the Office of Professional Responsibility on March 13, 2008. On April 8, 2008, Security Lieutenant Snyder, along with

---

[4] According to Plaintiff, the inmates who had submitted the confiscated affidavits were transferred to other institutions so that he was unable to replace them or have the inmates corroborate his allegations against the kitchen staff.

[5] The misconduct reports and documents issued after the search make no mention of any affidavits, and instead cite Plaintiff for possessing, *inter alia*, an illegal petition and UCC material.

Captain Griffin and Defendant Fisher, interviewed Plaintiff in the Security Office. They explained to Plaintiff that he was subject to a strip search at any time and Plaintiff was unable to give a concrete example of kitchen staff being racist. Plaintiff complained about the seizing of his legal documents but it was explained to him that the items that were confiscated were not "legal" materials, but rather a petition for which he received a misconduct.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having

reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## IV. DISCUSSION

### A. Failure to Exhaust Administrative Remedies

First, Defendants maintain that Plaintiff did not exhaust his administrative remedies as he was required to do before filing this suit pursuant to the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996). Through the PLRA, Congress amended 42 U.S.C. § 1997e(a) to prohibit prisoners from bringing an action with respect to prison conditions pursuant to 42 U.S.C. § 1983 or any other federal law, until such administrative remedies as are available are exhausted. Specifically, the act provides, in pertinent part, as follows:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion is required under this provision regardless of the type of relief sought and the type of relief available through administrative procedures. *See* Booth v. Churner, 532 U.S. 731, 741 (2001). In addition, the exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence, including those that involve general circumstances as well as particular episodes. *See* Porter v. Nussle, 524 U.S. 516, 532 (2002). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all

the available remedies prior to filing the action. *See* <u>Nyhuis v. Reno</u>, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings." <u>Id</u>. at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" <u>Id</u>. at 93 (quoting <u>Porter</u>, 534 U.S. at 525). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective . . . appeal." <u>Id</u>. at 83; *see also* <u>Spruill v. Gillis</u>, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion). Courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal courts. *See*, *e.g.*, <u>Booth v. Churner</u>, 206 F.3d 289 (3d Cir. 2000); <u>Bolla v. Strickland</u>, 304 F. App'x 22 (3d Cir. 2008); <u>Jetter v. Beard</u>, 183 F. App'x 178 (3d Cir. 2006).

This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. *See* <u>Camp v. Brennan</u>, 219 F.3d 279 (3d Cir. 2000) (Section 1997e(a) only requires that prisoners exhaust such administrative remedies "as are available"). However, case law recognizes a clear

"reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis, 49 F. App'x at 368; see also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp, 219 F.3d at 281 (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and correctional officers impeded filing of grievance).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. Harris, 149 F. App'x at 59. Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. Davis, 49 F. App'x at 368. Thus, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. Oliver v. Moore, 145 F. App'x 731 (3d Cir. 2005) (failure to exhaust not excused if,

after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

It is undisputed that Plaintiff did not exhaust his administrative remedies. He filed only two grievances relating to his claims before the Court, neither of which he appealed to final review in accordance with policy DC-ADM 804, Inmate Grievance System. In Grievance #214850, filed on January 15, 2008, Plaintiff provides his version of the incident which resulted in sugar being confiscated from his person and mentions that Defendant Verneau's acts were in retaliation for him complaining about the harassing pat-down searches. Plaintiff states that he was the only one who was singled out for pat-down searches but at the same time states that another inmate was searched as well. The Grievance was denied and although Plaintiff appealed to the Secretary's Office of Inmate Grievances and Appeals, that appeal was filed without action because he had not appealed to the Superintendent.

In Grievance #217079, filed on February 5, 2008, the day after Plaintiff was found guilty of the misconduct issued as a result of a cell search, Plaintiff complained that Defendant Fisher was not doing anything to stop the sexual harassment and abuse that was occurring in the kitchen and that his disciplinary sanction for engaging in unauthorized group activity and possession of contraband was issued in retaliation for complaining about the increased number of strip searches. He also complained that the kitchen staff was unauthorized to perform strip searches outside of the presence of a corrections officer and that Defendant Verneau was getting some sort of sexual pleasure from these searches. Following an investigation, the Grievance was denied but Plaintiff did not appeal.

Plaintiff states that he could not exhaust his administrative remedies because prison officials would not provide him with a prison handbook, which outlined the proper procedures

for appealing grievances. This allegation is somewhat rebutted by the fact that Plaintiff did appeal Grievance #214850, albeit incorrectly, and was specifically told in his response to that appeal that he needed to first appeal to the Superintendent. Plaintiff, however, failed to do so. Moreover, according to Plaintiff, he was "sexually abused" for over two years, beginning in 2006, yet he did not file a single grievance pertaining to this alleged abuse until 2008. The record evidence seems to suggest that Plaintiff simply did not file any grievances relating to his issues until after he was caught with his hand in the proverbial cookie jar and was then found guilty of the misconduct following the search of his cell. Even giving credit to Plaintiff's claim that there were obstacles in appealing his grievances and that prison officials would not submit his grievances for processing, this did not occur early 2008. At that time, more than two years of alleged abuse had already occurred of which Plaintiff never complained of in a single grievance. As such, the Court finds that Plaintiff did not exhaust his administrative remedies prior to filing this lawsuit and Defendants' Motions will be granted on this ground.

Alternatively, even if Plaintiff had properly grieved and exhausted his claims through the prison's grievance procedure, the Court finds, as discussed hereinafter, that Defendants are entitled to judgment as a matter of law on the merits of his claims.

## B. Sexual Assaults

### 1. Strip searches

Plaintiff alleges that the strip searches to which he was subjected were "sexual abuse" and violated of the Fourth Amendment. As an initial matter, inmates do not have a Fourth Amendment right to be free of strip searches, which may be conducted by prison officials without probable cause provided that the search is conducted in a reasonable manner. *See* Bell v. Wolfish, 441 U.S. 520 (1979). In Bell, the Supreme Court held that a prison rule requiring

pretrial detainees to expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the facility did not violate the Fourth Amendment. Recently, in <u>Florence v. Bd. of Chosen Freeholders of County of Burlington</u>, 132 S. Ct. 1510 (2012), the Supreme Court held that a jail policy of requiring that persons admitted to the jail remove their clothing and expose their genital areas for visual inspection as a routine part of the intake process also did not violate the Fourth Amendment. In doing so, the Court re-emphasized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." <u>Id</u>. at 1517. Indeed, where security is involved, "deference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated." <u>Id</u>. at 1518 (citation and internal quotation marks omitted). "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [legitimate security interests,] courts should ordinarily defer to their expert judgment in such matters." <u>Bell</u>, 441 U.S. at 548 (citation omitted); <u>Florence</u>, 132 S. Ct. at 1518.

Thus, in the context of the Fourth Amendment, courts must conduct a balancing of the need for a particular search against the invasion of personal rights that the search entails. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." <u>Bell</u>, 441 U.S. at 559. Strip searches that are excessive, vindictive, harassing, or unrelated to any legitimate penological interest may violate the Fourth Amendment. *See*, *e.g.*, <u>Michenfelder v. Sumner</u>, 860 F.2d 328, 332 (9th Cir. 1988).

In this case, the Third Circuit vacated and remanded on Plaintiff's Fourth Amendment claim after finding that the Court had failed to examine the circumstances surrounding the

various searches in the light most favorable to Plaintiff. Following remand, Plaintiff filed a second amended complaint but his allegations in that complaint, like his original complaint, are nonspecific with regard to dates of strip searches and those officers (or kitchen staff members) who were present during the searches. In fact, the Court is unable to determine just how many times Plaintiff was allegedly strip searched during the relevant period. This is not to say that there were too many to count, but rather, it appears that Plaintiff may have been searched only twice over a two year period. While Plaintiff writes in general, vague terms about the strip searches to which the kitchen workers were subjected, he fails to delineate with specificity even one instance where he was allegedly subjected to an unreasonable strip search within the meaning of the Fourth Amendment except simply to state that during the unspecified searches, Defendant Verneau would humiliate him by shining a flashlight in his anal cavity in order to look for contraband. Moreover, although the Third Circuit may have read Plaintiff's original complaint to have contained allegations of inappropriate touching during these strip searches, the Court has been unable to find such allegations in his original complaint, amended complaint, second amended complaint and subsequent filings. Instead, it is clear that Plaintiff characterizes the strip searches as "sexual abuse" and "sexual harassment" solely because, in his opinion, they were conducted without any legitimate penological purpose and possibly for the sexual pleasure of Defendant Verneau. In fact, the only allegations of any inappropriate physical contact appear to be in connection with the pat-down searches that were implemented in 2007. These searches, however, will be addressed in the following section.

Apart from Plaintiff's bald assertion regarding the legitimacy of these searches, there is virtually no evidence in the record to suggest that the strip searches he was forced to undergo were conducted outside of the scope of the Fourth Amendment. Plaintiff makes clear that he was

not the only inmate subjected to these searches and that the searches were performed in small groups behind closed doors. While Plaintiff gives several differing theories regarding their justification (such as punishment for inmates wearing their pants too low and because the kitchen staff was racist and gay) Plaintiff has offered nothing to support these averments and Defendants maintain that the searches were necessary to prevent theft and curtail possible violence that could result from inmates having knives and other metal utensils in their possession. This is supported by Plaintiff's own admission that it was common for inmates to take food from the kitchen and the record supports that he himself was caught stealing from the kitchen on at least one occasion, a fact that he originally denied in his initial complaint but has since admitted. Plaintiff has also submitted the declaration of several inmates who worked in the kitchen at SCI-Somerset during the relevant time period and at least two of them also admit to having stolen food or sugar from the kitchen as well and on numerous occasions.[6]

Plaintiff's characterization of these searches as "sexual abuse" simply because he deemed them humiliating, or because he disagreed with the reason for why they were being conducted and believed that no cause existed, does not demonstrate any constitutional wrongdoing. There is simply nothing in the record to call into question the reasonableness of the strip searches at issue in this case, whether it be the need for them or the manner in which they were conducted, or to suggest that the searches were an exaggerated response to what was obviously a legitimate penological concern. Therefore, Plaintiff is unable to demonstrate a material issue of fact with regard to his Fourth Amendment claim as it relates to strip searches.[7]

---

[6] *See* ECF No. 125-4 at 2, 10, 11.

[7] Plaintiff makes several allegations that the kitchen staff members, including Defendant Verneau, conducted strip searches outside of the presence of a corrections officer and they were not authorized to do so per prison rules and regulations. Even assuming that the search violated a state correctional regulation, such a violation would not render

## 2. Pat-down searches

The Court notes that the Third Circuit did not specifically remand this case with regards to Plaintiff's allegations that Defendant Verneau inappropriately touched him during pat-down searches because it appears as though it construed Plaintiff's complaint to read that the alleged inappropriate sexual contact occurred only during strip searches. However, this Court finds it clear that such contact did not occur during the aforementioned strip searches, but rather during frequent, routine pat-down searches in which Plaintiff claims Defendant Verneau would massage his genitals and grab and squeeze his penis through his clothing, while making comments suggesting that he was obtaining some sort of sexual pleasure from doing so. Even though the Third Circuit did not address these specific allegations as they related to the pat-down searches, the Court will nevertheless address them at this time.

As previously noted, whether a particular search is reasonable under the Fourth Amendment requires a balancing of the scope of intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. Bell, 441 U.S. at 559. Applying these factors to this case, the Court finds that the pat-down searches of which Plaintiff complains did not violate the reasonableness standard of the Fourth Amendment, largely for the

---

the search *per se* unreasonable under the Fourth Amendment. *See, e.g.*, City of Ontario, Cal. v. Quon, 130 S. Ct. 2619, 2632 (2010); California v. Greenwood, 486 U.S. 35, 43-44 (1988). Moreover, state agency guidelines do not, in and of themselves, create a right, and do not have the force of law. *See* Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142, 154 (3d Cir. 2004); *see also* Atwell v. Lavan, 557 F. Supp. 2d 532, 556 n.24 (M.D. Pa. Dec. 21, 2007) (a prison policy manual does not have the force of law and does not rise to the level of a regulation). Therefore, a violation of internal policy or procedure does not automatically rise to the level of a Constitutional violation. Whitcraft v. Township of Cherry Hill, 974 F. Supp. 392, 398 (D. N.J. 1996) (citing Daniels v. Williams, 474 U.S. 327, 332-33 (1986); Edwards v. Baer, 863 F.2d 606, 608 (8th Cir. 1988); Jones v. Chieffo, 833 F. Supp. 498, 505-06 (E.D. Pa. 1993)). *See also* Hovater v. Robinson, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); Walker v. Zenk, No. 01-1644, 2007 U.S. Dist. LEXIS 96351, at *29-30 n.19 (M.D. Pa. Nov. 15, 2007) (*adopted in part and rejected in part by* 2008 U.S. Dist. LEXIS 9086 (M.D. Pa. Feb. 7, 2008) ("[A]lleged violations of prison policies do[] not rise to the level of a Constitutional claim."); Estrella v. Hogsten, No. 06-1340, 2007 U.S. Dist. LEXIS 51208, at *21 (M.D. Pa. July 16, 2007) (holding that mere failure of prison officials to follow their own regulations alone is not a constitutional violation).

same reasons previously discussed *supra* with regard to the strip-searches. Significantly, Defendants state that every inmate kitchen worker is pat searched at the beginning and end of his shift in order to prohibit inmates from stealing from the kitchen and from removing objects that could pose a threat to the security of the prison. Moreover, courts have found these pat-down searches to pose only a limited intrusiveness on bodily privacy and most have sustained such searches under the Fourth Amendment in light of the State's interest in deterring the possession and movement of contraband.

Plaintiff vociferously argues that there was absolutely no need for the searches to be conducted. Therefore, it appears that he is under the impression that the searches were conducted solely for the pure sexual enjoyment of the kitchen staff and thus constituted "sexual abuse." However, Plaintiff's argument that there was no legitimate penological reason for the searches, including the pat-down searches at issue, is wholly discredited by the record, including his own evidence in support of his motion for summary judgment. Plaintiff admits that inmates often stole food from the kitchen and he himself was caught stealing sugar packets that were discovered pursuant to a pat-down search conducted by Defendant Verneau. Additionally, Plaintiff has submitted the declaration of Michael Thomas who admits to stealing tuna fish from the kitchen, which also was discovered pursuant to a pat-down search.[8] Unquestionably, "detect[ing] and deter[ing] the possession of contraband" is a legitimate penological objective. Florence, 132 S. Ct. at 1517.

Moreover, Plaintiff has not demonstrated that the manner in which he was searched was unreasonable under the circumstances. While Plaintiff objects to the legitimacy of the searches altogether, he also objects to the need for physical contact with his genitals during such searches.

---

[8] ECF No. 125-4 at 2.

However, a routine pat-down search, which includes the groin area, is a constitutional method of ensuring prison security. *See* <u>Grummett v. Rushen</u>, 779 F.2d 491, 495 (9th Cir. 1985) ("routine pat-down searches, which include the groin area, and which are otherwise justified by security needs" do not violate the Constitution). In describing these searches in the context of the Eighth Amendment, one court has explained:

> [a]ny manual search of an individual's body will require some amount of manipulation of the genitals in order to accomplish the purpose of the search. Although "grabbing" and "tugging" could cause some discomfort and embarrassment, it does not rise to the level of "unnecessary and wanton infliction of [pain]" so long as it occurs as part of an otherwise justified search.

<u>Cherry v. Frank</u>, No. 03-129, 2003 U.S. Dist. LEXIS 26495, 2003 WL 23205817, at *12 (W.D. Wis. Dec. 4, 2003). In this case, the need for the pat-down searches of which Plaintiff complains is obvious and his allegations fall far short of establishing otherwise or that they were conducted in an unreasonable manner. Therefore, Plaintiff's Fourth Amendment claim fails.

Likewise, Plaintiff has also not alleged facts demonstrating that these pat-down searches violated the Eighth Amendment's proscription against cruel and unusual punishment. A punishment is cruel and unusual when it inflicts unnecessary and wanton pain, including those that are totally lacking in penological justification, <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981), and those which evince "calculated harassment unrelated to prison needs." <u>Hudson v. Palmer</u>, 468 U.S. 517, 530 (1984). To be actionable, the "punishment" must be "objectively, sufficiently serious," and the official must have acted with a "sufficiently culpable state of mind." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

The Supreme Court has not defined what constitutes "objectively, sufficiently serious" but the vast majority of courts to have addressed the issue have found that isolated instances of inappropriate conduct by prison officials do not violate an inmate's constitutional rights. *See*,

*e.g.*, <u>Washington v. Harris</u>, 186 F. App'x 865, 866 (11th Cir. 2006) (holding that inmate failed to state Eighth Amendment claim where a prison guard "crept up behind [the prisoner inmate] while he was working," grabbed his genitals, kissed him on the mouth, and threatened to perform oral sex on him); <u>Jackson v. Madery</u>, 158 F. App'x 656, 661 (6th Cir. 2005) (holding that the plaintiff's allegations that a guard grabbed and rubbed his buttocks in a degrading manner during a shakedown in the food area was insufficient to establish an Eighth Amendment violation); <u>Hughes v. Smith</u>, 237 F. App'x 756, 759 (3d Cir. 2007) (holding that the inmate had not alleged an Eighth Amendment violation where the correctional officer allegedly touched the inmate's testicles through his clothing during a single pat-down frisk); <u>Young v. Brock</u>, No. 10-cv-01513, 2012 U.S. Dist. LEXIS 14262, 2012 WL 385494, at *4 (D. Colo. Feb. 7, 2012) (holding that the plaintiff's allegations that he was subjected to unnecessary and unwelcomed sexual touching by a prison guard in the course of a single pat-down search did not state a claim under the Eighth Amendment, particularly where the plaintiff conceded that the pat-down had a penological purpose); <u>Pantusco v. Sorrell</u>, No. 09-cv-3518, 2011 U.S. Dist. LEXIS 58040, 2011 WL 2148392, at *7-8 (D.N.J. May 31, 2011) (holding that the plaintiff's Eighth Amendment claim failed because a single instance of groping during a routine pat-down frisk did not amount to cruel and unusual punishment); <u>Escobar v. Reid</u>, 668 F. Supp. 2d 1260, 1278, 1295-96 (D. Colo. 2009) (holding that a guard's alleged suggestive, sexual touching of an inmate did not state a constitutional violation); <u>Williams v. Anderson</u>, No. Civ. A. 03-3254, 2004 U.S. Dist. LEXIS 20305, 2004 WL 2282927, at *4 (D. Kan. Sept. 7, 2004) (finding no Eighth Amendment violation where a prison guard grabbed a pre-trial detainee's buttocks, exposed his genitals to the inmate plaintiff, and made crude sexual remarks).

Instead, only severe or repetitive sexual abuse has been found to rise to the level of an Eighth Amendment violation. *See*, *e.g.*, <u>Schwenk v. Hartford</u>, 204 F.3d 1187 (9th Cir. 1999) (repeated requests for oral sex and attempted rape of inmate by prison guard may establish Eighth Amendment claim); <u>United States v. Walsh</u>, 194 F.3d 37 (2d Cir. 1999) (corrections officer who repeatedly steps on inmate's penis to wantonly inflict pain violates inmate's right to be free of cruel and unusual punishment); <u>Berry v. Oswalt</u>, 143 F.3d 1127 (8th Cir. 1998) (rape and harassment of inmate, including propositions, sexual comments, and attempts to perform nonroutine pat-down violated inmate's Eighth Amendment right to be free from cruel and unusual punishment).

While in this case Plaintiff may be able to meet the subjective prong of the two-prong Eighth Amendment test, the alleged facts are not sufficiently serious enough to satisfy the required objective element. Despite the inappropriate comments that Defendant Verneau allegedly made during the pat-down searches, Plaintiff's allegation that his genitals were "massaged" or "squeezed" during what were otherwise normal, routine pat-down searches conducted as a consequence to his kitchen job is simply insufficient to establish an Eighth Amendment violation, particularly given the fact that touching of the groin area over clothing during a pat-down search would be necessary in order to look for food and other kitchen items. *See* <u>Davis v. Castleberry</u>, 364 F. Supp. 2d 319, 321-22 (W.D. N.Y. 2005) (finding allegation that officer grabbed inmate's penis during routine pat-down insufficient to state constitutional claim and noting that a legitimate pat-down may require touching inmate's genital area for the search to be effective); <u>Williams v. Keane</u>, No. 95 Civ. 0379, 1997 U.S. Dist. LEXIS 12665, 1997 WL 527677, at *11 (S.D. N.Y. Aug. 25, 1997) (no Eighth Amendment claim where inmate alleged

that his testicles were fondled by officer as part of a routine pat-down exiting the mess hall). Therefore, any asserted Eighth Amendment claim fails as well.

## C. Retaliation

Plaintiff claims that he was subjected to mistreatment as a result of filing grievances and threats to report alleged sexual abuse. Although he maintains that virtually everything that was done to him was done in retaliation for his actions, the Court will address this claim as it relates to (1) the intensified search regimen to which Plaintiff was subjected, (2) the search of Plaintiff's cell on January 28, 2008, (3) the misconduct issued on January 28, 2008, and (4) the alleged tampering with Plaintiff's legal mail.

It is well settled that retaliation for the exercise of a constitutionally protected activity is itself a violation of rights secured by the Constitution, which is actionable under section 1983. Rauser v. Horn, 341 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) that the conduct in which he engaged was constitutionally protected; (2) that he suffered "adverse action"[9] at the hands of prison officials; and (3) that his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct.[10] Rauser, 241 F.3d at 333 (adopting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). Once all three criteria are met, the burden then shifts to the defendants "to prove by a preponderance of the evidence that it would have taken the same

---

[9] An adverse action is one "sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

[10] The crucial third element, causation, requires a plaintiff to prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)).

disciplinary action even in the absence of the protected activity." Rauser, 241 F.3d at 333. This means that "prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Id. at 334 (incorporating Turner v. Safley, 482 U.S. 78, 89 (1987)).

Assuming Plaintiff engaged in a constitutionally protected activity,[11] the question then becomes whether Defendants' actions of which he complains were sufficient to deter a person of ordinary firmness from engaging in such protected activity and whether Plaintiff engaging in the protective activity was the substantial motivating factor behind the alleged retaliatory acts. However, Defendants have met their burden by demonstrating that they would have made the same decisions even absent any protected conduct, and, therefore, the Court finds that it is unnecessary to engage in such an analysis in this case at least with respect to Plaintiff allegations regarding the search of his cell and misconduct issued on January 28, 2008.

In a somewhat convoluted manner, Plaintiff claims that in retaliation for his threats to "blow the whistle" on the alleged sexual abuse that was occurring in the kitchen, Defendant Fisher called Defendants Glass and Papuga, who then called Defendant Snyder, who ordered Defendants Troy and Pratts to go to his cell and confiscate all incriminating evidence against the kitchen staff. As a result of such investigative search, Plaintiff was issued a misconduct charging him with three infractions: (1) engaging in or encouraging unauthorized group activity, (2) possession or circulation of a petition which is a document signed by two or more persons or demanding that something happen or not happen without the authorization of the Superintendent,

_____

[11] A prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim. See Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution); Woods v. Smith, 60 F.3d 1161, 1165 (5th Cir. 1995) (prison officials may not retaliate against an inmate for complaining about a guard's misconduct).

and (3) possession of contraband. Although Plaintiff maintains that the search of his cell and issuance of misconduct were in retaliation for his complaints and threats, the record demonstrates that the search was only conducted after an informant provided a tip to the Security Office suggesting that Plaintiff was compiling a petition, an action that is against prison policy. The petition was discovered in Plaintiff's wall locker and included several pages of signed statements provided by other inmates pertaining to the increased security measures in the kitchen. As a result, Plaintiff was issued the misconduct, found guilty by the hearing examiner and sanctioned to sixty days of disciplinary confinement in the RHU. Accordingly, the record reflects that Plaintiff's cell would have been searched and the misconduct would have been issued for reasons reasonably related to legitimate penological interests despite any constitutionally protected activity in which Plaintiff may have engaged. Therefore, his retaliation claim fails with respect to these actions.

Plaintiff also maintains that he became a "target" for unnecessary, harassing searches of his body in retaliation for filing grievances and complaining about the increased number of "abusive" searches taking place on the young, black inmates working in the kitchen. Notably, Plaintiff states that he was a "target" for these searches while at the same time essentially stating that all kitchen workers were "targets" for these searches. Indeed, the whole reason Plaintiff states that he was targeted is because he complained about the increased number of searches. Therefore, it is suspect whether Plaintiff can demonstrate the necessary third element for a retaliation claim, *i.e.*, that the sole reason he was subjected to an increased number of searches was because of his complaints about the number of searches that were taking place. In fact, Plaintiff has submitted declarations from several other inmates who were working in the kitchen during the relevant time period and also have the same complaints with regard to the number of

23

times they were searched. Nevertheless, it is clear from the record that the increased number of searches was due, in part, to inmate theft and the security implications that stemmed therefrom. Therefore, even if Plaintiff were able to show all three elements of a retaliation claim as it relates to these searches, which he specifically has not, Defendants have demonstrated that these searches would have taken place even absent any protected conduct in which Plaintiff may have engaged. Therefore, such a claim fails.

Finally, Plaintiff maintains that prison officials tampered with his mail when he was confined in the RHU, serving his sanction for the misconduct issued on January 28, 2008. As a result, he claims that he had to "fish" his outgoing mail to inmates in neighboring cells and allegedly as a consequence several legal proceedings he had commenced were dismissed for his failure to prosecute. In his original complaint, Plaintiff also claimed that such tampering by officials interfered with his access to the courts. Although Plaintiff had initially failed to state an access to courts claim, on appeal, the Third Circuit remanded finding that Plaintiff could possibly cure the defect if he was granted leave to amend. Plaintiff amended his complaint but was still unable to state a claim for an access to courts violation and the claim was dismissed with prejudice on August 21, 2012. Relevant to the Court's analysis here is that Plaintiff failed to allege that he suffered an actual injury due to Defendants' alleged tampering with his legal mail.

Plaintiff has not set forth sufficient factual allegations which would support his retaliation claim as it relates to mail tampering. There are no allegations in his second amended complaint, Motions for Summary Judgment or briefs in opposition to Defendants' Motions for Summary Judgment that any legal action he had commenced was dismissed for his failure to prosecute due to the alleged tampering with his mail, nor are there allegations that his legal mail was being opened and read outside of his presence. Instead, it appears that the only allegation that would

remotely relate to a mail tampering retaliation claim is his claim that defendants did not submit his grievances from processing. This factual allegation has already been taken into consideration with respect to Defendants' argument regarding Plaintiff's failure to exhaust his administrative remedies, notwithstanding that it is discredited by the fact that Plaintiff was able to file at least one grievance while he was in the RHU. Other than this, there are no other allegations to support Plaintiff's retaliation claim as it relates to mail tampering. Accordingly, Plaintiff's cannot succeed on this claim.

**D.      Defendant Jeschonek**

Defendants have filed a Suggestion of Death for Defendant Dennis Jeschonek,[12] a former employee of SCI-Somerset who died on August 24, 2010. According to Federal Rule of Civil Procedure 25(a)(1), an action against a deceased party shall be dismissed if a Motion for Substitution of the proper party is not made within 90 days after a Suggestion of Death is filed. *See* Ray v. Kertes, 130 F. App'x 541 (3d Cir. 2005). The Suggestion of Death was filed in this instance on November 6, 2012, and 90 days has expired without a Motion for Substitution of the proper party for Defendant Jeschonek. Therefore, this action shall be dismissed as against him. An appropriate Order follows.

**AND NOW** this 28th day of August, 2013;

**IT IS HEREBY ORDERED** that Plaintiff's Motions for Summary Judgment (ECF Nos. 114 & 122) are **DENIED**.

**IT IS HEREBY ORDERED** that the Motions for Summary Judgment filed by defendants Glass, Jechoneck, Papuga, Pritts, Ream, Snyder, and Verneau (ECF No. 115) and defendant Fisher (ECF No. 119) are **GRANTED**.

---

[12] Misspelled by Plaintiff in his second amended complaint as "Jechonech."

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiff has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

_____
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc:  Joseph Watson
     EF-9383
     S.C.I. Somerset
     1590 Walters Mill Road
     Somerset, PA  15510-0001

     Counsel of record.